IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (CINCINNATI)

|  |  |  |
|---|---|---|
| **In re: BROADWING, INC.**<br>**ERISA LITIGATION** | : | CASE NO.  C-1-02-857 |
|  | : |  |
|  | : | Judge Sandra J. Beckwith |
|  | : |  |
|  | : | Magistrate Judge Timothy Hogan |
|  | : |  |

## CONSOLIDATED ERISA CLASS ACTION COMPLAINT

### INTRODUCTION

1.      This is a civil enforcement action brought by Plaintiffs pursuant to the
Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. 1001, et seq.
Plaintiffs bring this action on behalf of the participants and beneficiaries of the Cincinnati
Bell, Inc. Savings and Security Plan, the Broadwing Retirement Savings Plan (the
"Plans" or "Broadwing 401(k) Plans"), and the Plans themselves, to remedy Defendants'
breaches of fiduciary duty under ERISA.

2.      Plaintiffs bring this action to obtain relief on behalf of the Plans under
ERISA Section 502(a)(2), 29 U.S.C. §1132(a)(2).  Plaintiffs also seek relief on behalf of
themselves and a proposed Class of similarly situated participants and beneficiaries of
the Plans as a proposed class action pursuant to Rule 23 of the Federal Rules of Civil
Procedure for classwide relief under Section 502(a)(3) of the Employee Retirement
Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(3).

3.      The Plans in which Plaintiffs participated are retirement plans
administered and sponsored by Cincinnati Bell, Inc., formerly known as Broadwing, Inc.
("Cincinnati Bell," "Broadwing" or the "Company"), and administered by the Company,
acting through its senior management and certain members of its Board of Directors,

the Company's Employees' Benefit Committee, and the Plans' Trustee (collectively, "Defendants").

4.      Defendants acted as fiduciaries with respect to the Plans. During the Relevant Period to this action, between November 9, 1999 and February 28, 2003 (also termed the "Class Period"), Defendants breached their fiduciary duties of loyalty and prudence to the Plans and their participants by, among other things, maintaining imprudent concentrated investments in Company stock, exposing the Plans to unreasonable risk of loss and injury, failing to monitor the prudence of the Plans' investments, and failing to monitor and provide necessary information to those to whom fiduciary duties had been delegated.

5.      Defendants had a duty to provide complete and accurate information regarding Plan investments, including company stock. Defendants failed to provide Plaintiffs and Class Members with adequate information about the Company's true financial condition and prospects despite offering the Company's stock as a savings plan investment.

6.      As a result of Defendants' failure to disclose the material adverse condition of the Company, Plaintiffs and Class Members were misled and deprived of their opportunity to make informed judgments as to their investments in Broadwing stock.

7.      If Plaintiffs and Class Members had been properly and adequately informed about: (a) the true financial condition of the Company; and (b) the myriad risks associated with investing in Company stock, they would not have invested their retirement funds in Broadwing common stock or maintained significant investments in

2

Broadwing common stock in the Plans and they would not have sustained the losses they ultimately endured.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to ERISA, 29 U.S.C. §1132(e)(1).

9.    This Court has personal jurisdiction over Defendants because, as required by ERISA, 29 U.S.C. §1132(e)(2), one or more of the Defendants is found in this District. The Court also has personal jurisdiction over Defendants because the Company's principal executive offices are in Cincinnati, Ohio. Defendants systematically and continuously do business in this state and the case arises out of Defendants' acts within this state.

10.   Venue is proper pursuant to ERISA, 29 U.S.C. §1132(e)(2), because Defendants administer the Plans in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and one or more of the Defendants may be found in this District.

## THE PARTIES

11.   Plaintiff Linda Hughes is a resident of the State of Florida. Ms. Hughes was, at relevant times, a participant in the Plan within the meaning of ERISA, 29 U.S.C. §1002(7) & (8). Ms. Hughes suffered losses in her 401(k) account as a result of Defendants' breaches of fiduciary duty.

12.   Plaintiff Jeremiah Hurley is a resident of the State of Ohio. Mr. Hurley was, at relevant times, a participant in the Plans within the meaning of ERISA, 29

3

U.S.C. §1002(7) & (8). Mr. Hurley suffered losses in his 401(k) account as a result of Defendants' breaches of fiduciary duty.

13.     Plaintiff Richard Jennings is a resident of the State of Kentucky. Mr. Jennings was, at relevant times, a participant in the Plans within the meaning of ERISA, 29 U.S.C. §1002(7) & (8). Mr. Jennings suffered losses in his 401(k) account as a result of Defendants' breaches of fiduciary duty.

14.     Plaintiff Kathleen Ann Kurtz is a resident of the State of Ohio. Ms. Kurtz was, at relevant times, a participant in the Plans within the meaning of ERISA, 29 U.S.C. §1002(7) & (8). Ms. Kurtz suffered losses in her 401(k) account as a result of Defendants' breaches of fiduciary duty.

15.     Plaintiff Kevin Streckfuss is a resident of the State of Ohio. Mr. Streckfuss was, at relevant times, a participant in the Plans within the meaning of ERISA, 29 U.S.C. §1002(7) & (8). Mr. Streckfuss suffered losses in his 401(k) account as a result of Defendants' breaches of fiduciary duty.

16.     Plaintiff Patricia Fleager is a resident of the State of Ohio. Ms. Fleager was, at relevant times, a participant in the Plans within the meaning of ERISA, 29 U.S.C. §1002(7) & (8). Ms. Fleager suffered losses in her 401(k) account as a result of Defendants' breaches of fiduciary duty.

17.     Plaintiff Sandra Bryant is a resident of the State of Kentucky. Ms. Bryant was, at relevant times, a participant in the Plans within the meaning of ERISA, 29 U.S.C. §1002(7) & (8). Ms. Bryant suffered losses in her 401(k) account as a result of Defendants' breaches of fiduciary duty.

4

**DEFENDANTS**

18.     Defendant Cincinnati Bell, Inc. ("Broadwing" or "Company") is an Ohio

corporation with its principal place of business at 201 East Fourth Street, Cincinnati,

Ohio. The Company is the Plans' Sponsor and Plan Administrator as defined by ERISA

and is a named fiduciary with respect to the Plans. On information and belief, the

Company, at all times, had and exercised discretionary authority and control respecting

the management of the Plans, and the management or disposition of the Plans' assets,

in its own name and acting through its agents including, but not limited to, its executive

officers, members of the Board of Directors, and the Company's Employees' Benefit

Committee. In particular but without limitation, Defendant Cincinnati Bell:

(a)     Exercised discretion as to whether to make matching employer
contributions into the Plans, described below, in cash or in stock,
and discretion as to whether to direct the trustees to sell stock for
investment by the Plans;

(b)     Established the range of investments available to the Plans'
participants and had a fiduciary duty to review the performance and
suitability of investment options;

(c)     Imposed restrictions on sale of shares held in the Broadwing, Inc.
Common Stock Fund and failed to lift those restrictions when it
would have been prudent to so do, which had the effect of depriving
Plaintiffs and Class Members of the opportunity to exercise control
over their Plan assets and/or forced them to concentrate their Plan
assets in Companystock; and

(d)     On information and belief and in anticipation of further discovery,
communicated information concerning the actual and projected
financial condition and performance of the Company and the value
of its stock directly to participants for the purpose of affecting their
decisions concerning whether or not to buy or sell Company stock,
and exerted undue influence through its agents and directors upon
the actions both of named fiduciaries and plan participants in
regard to their decisions whether or not to direct the trustee to
invest the Plans' assets in the Company Stock Fund.

19.     The Company was responsible for the appointment and ongoing monitoring and review of the performance of the trustee and the Plans' fiduciaries.

20.     Defendant Fidelity Management Investment Trust Company ("Fidelity") served as asset custodian and the Trustee of the Plans from January 2, 2001 until present.  Fidelity's offices are located at 82 Devonshire Street, Boston, MA 02109.

21.     Defendant Fidelity was a fiduciary of the Plans within the meaning of ERISA in that it exercised authority and control over the management or disposition of the Plans' assets, in particular, but not limited to, determining whether to purchase and hold shares in the Broadwing, Inc. Common Stock Fund.

22.     On information and belief and in anticipation of future discovery, Fidelity also acted at all times relevant hereto as an advisor to other fiduciaries on matters concerning the disposition and control of Plan assets.

23.     On information and belief and in anticipation of further discovery, Defendant Fidelity was responsible for evaluating the performance of all Plan funds, including the Broadwing, Inc. Common Stock Fund, and it was responsible for communicating investment information and advice to Plan participants through regular account statements and investment newsletters, through which it gave investment advice to participants and beneficiaries.

## INDIVIDUAL DEFENDANTS

24.     Defendant Richard G. Ellenberger served at times relevant hereto as the Company's President and Chief Executive Officer and as a Director.  Defendant Ellenberger resigned as Chief Executive Officer and Director in September 2002.  On information and belief, he had and exercised discretionary authority or control

6

respecting management of the Plans and authority or control respecting management or disposition of their assets and thus acted as a fiduciary with respect to the Plans under ERISA.

25.    Defendant Kevin W. Mooney served at times relevant hereto as the Company's Executive Vice President and Chief Financial Officer. Defendant Mooney was appointed Chief Executive Officer in September 2002. On information and belief, he had and exercised discretionary authority or control respecting management of the Plans and authority or control respecting management or disposition of their assets and thus acted as a fiduciary with respect to the Plans under ERISA.

26.    Defendant John F. Cassidy served at times relevant hereto as the Company's Chief Operating Officer. On information and belief, Defendant Cassidy had and exercised discretionary authority or control with respect to the management of the Plans and authority or control respecting the disposition of their assets and thus acted as a fiduciary to the Plans under the terms of ERISA.

27.    Defendant Lawrence J. Bouman served at times relevant hereto as a Director of the Company and as a member of the Audit and Finance Committee ("Audit Committee"). The Audit Committee was responsible for, among other things, reviewing and overseeing the Company's financial affairs, including its financial reporting, capital structure, borrowing limits and financing of corporate acquisitions and it was also responsible for monitoring the performance of its benefit plans, including the Plans in this case. In these capacities, Defendant Bouman exercised discretionary authority or control with respect to the management of the Plans and authority or control respecting the disposition of their assets and thus acted as a fiduciary to the Plans under the terms

7

of ERISA. Effective August 1, 2003, Defendant Bouman resigned from the Board of Directors.

28. Defendant Phillip R. Cox served at times relevant hereto as a Director of the Company and was a member of the Audit Committee. Defendant Cox was also a member of the Board's Compensation Committee, which was directly responsible for reviewing the Company's executive compensation and for monitoring the administration of the Company's employee benefit plans and programs, including the Plans at issue in this case. In these capacities, Defendant Cox had and exercised discretionary authority or control with respect to the management of the Plans and authority or control respecting the disposition of their assets and thus acted as a fiduciary to the Plans under the terms of ERISA.

29. Defendant J. Taylor Crandall served at all relevant times as a Director of the Company andas a member of the Compensation Committee. In these capacities, Defendant Crandall had and exercised discretionary authority or control with respect to the management of the Plans and authority or control respecting the disposition of its assets and thus acted as a fiduciary to the Plans under the terms of ERISA.

30. Defendant William A. Friedlander served at all relevant times as a Director of the Company and as Chair of the Audit CommitteeIn these capacities, Defendant Friedlander had and exercised discretionary authority or control with respect to the management of the Plans and authority or control respecting the disposition of its assets and thus acted as a fiduciary to the Plans under the terms of ERISA.

31. Defendant Karen M. Hoguet served at all relevant times as a Director of the Company and as a member of the Audit Committee. In these capacities, Defendant

8

Hoguet had and exercised discretionary authority or control with respect to the management of the Plans and authority or control respecting the disposition of their assets and thus acted as a fiduciary to the Plans under the terms of ERISA.

32.     Defendant James D. Kiggen served at all relevant times as a Director of the Company and as Chairman of the Company. In these capacities, Defendant Kiggen had and exercised discretionary authority or control with respect to the management of the Plans and authority or control respecting the disposition of their assets and thus acted as a fiduciary to the Plans under the terms of ERISA.

33.     Defendant Mary D. Nelson served at relevant times as a Director of the Company and member of the Audit Committee. In these capacities, Defendant Nelson had and exercised discretionary authority or control with respect to the management of the Plans and authority or control respecting the disposition of their assets and thus acted as a fiduciary to the Plans under the terms of ERISA.

34.     The Defendants referenced above in the prior paragraphs, all of whom are individual persons, are referred to as the "Individual Defendants."

## BENEFIT PLAN DEFENDANTS

35.     Defendant Broadwing's Employee Benefit Committee was and is a "named fiduciary," a fiduciary and administrator of the Plans within the meaning of ERISA , as set forth in 29 U.S.C. § 1002(21)(A). The Employee Benefit Committee's principal place of business is the same as that of the Company headquarters in downtown Cincinnati, Ohio.

36.     Defendant Employee Benefit Committee was appointed by the Company to undertake certain responsibilities for the Plans' administration. Upon information and

9

belief, and in anticipation of future discovery, the Employee Benefit Committee was responsible for, among other things, determining the investment alternatives available for investment pursuant to the provisions of the Plans and monitoring the prudence of the investment alternatives offered by the Plans, including the Company Stock Fund.

37.     Plaintiffs allege, upon information and belief and in anticipation of further discovery, that the Employee Benefit Committee also had, or assumed, discretionary authority to change investment options within one or both of the Plans.

## CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The requirements of subparts 23(a), 23(b)(2) and 23(b)(3) are met with respect to the Class defined below.

39.     The Class consists of:

> All participants and beneficiaries of the Plans for whose individual accounts the Plans held shares of Broadwing common stock at any time from November 9, 1999, through February 28, 2003 (the "Relevant Period").  Excluded from the Class are the Court, the Defendants, the officers and directors of Broadwing, members of their immediate families, their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

40.     The Class consists of thousands of persons located in various parts of the United States.  Class members are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The exact number and identity of Class members can be determined through discovery.

41.     There is a well-defined community of interest in the questions of law and

fact involved in this case. Questions of law and fact common to Class members which

predominate over questions which may affect individual Class members include:

       (a)    Whether ERISA applies to the claims at issue here;

       (b)    Whether Defendants owed fiduciary duties to Class members;

       (c)    The nature and extent of the fiduciary duties Defendants owe or owed to Class members;

       (d)    Whether Defendants breached their fiduciary duties under ERISA; and

       (e)    The extent of harm sustained by Class members and the appropriate measure of relief.

42.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and

Class members suffered similar harm as a result of Defendants' unlawful and wrongful

conduct. Absent a class action, Class members may not receive restitution or other

appropriate relief and will continue to suffer losses, and these violations of law will

proceed without remedy.

43.     Plaintiffs are committed to pursuing this action and have retained counsel

experienced in class action litigation of this nature. Plaintiffs will fairly and adequately

represent the interests of the Class and Plaintiffs have no interests which conflict with

those of the Class.

44.     The prosecution of separate actions by Class Members would create a

risk of establishing incompatible standards of conduct for Defendants. Individual

actions may, as a practical matter, be dispositive of the interests of the Class.

11

45.    A class action is the superior method for fair and efficient adjudication of this controversy. The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Plaintiffs' Counsel, highly experienced in class action litigation, see no difficulty in the management of this case as a class action.

### Administration of the Plans

46.    The Plans named the Company as the Plan Administrator. On information and belief and in anticipation of further discovery, the Company performed the duties of the Plan Administrator, acting by and through its senior management, including Defendants Ellenberger, Mooney, and Cassidy, the Board's Compensation Committee, and the Employee Benefit Committee.

47.    Defendants exercised discretionary authority respecting the Plans' management or administration within the meaning of ERISA § 3(21)(A) by undertaking to perform the duties of the Administrator as set forth in the Plan.

48.    The Individual Defendants assigned or attempted to assign responsibility for complying with fiduciary responsibilities to selected agents, including the Employee Benefit Committee, or other committees and employees, and upon information and belief, to Fidelity. By such authority, the Defendants exercised control over the Plan, or, alternatively deprived their agents of the capacity to exercise fiduciary duties independently. By these and other actions, the Individual Directors constituted themselves as fiduciaries as set forth in ERISA § 3(21)(a).

49.    On information and belief and in anticipation of further discovery, Defendants exercised discretionary authority respecting the Plans' management and/or

12

administration within the meaning of ERISA, 29 U.S.C. §1002(21)(A), including the discretionary authority to appoint or remove investment managers, to select investment options, to allocate assets and contributions, to appoint or remove administrative managers, and generally to operate the Plans.

50.     To the extent that any of the Defendant fiduciaries attempted to delegate their fiduciary authority, they retained a duty to monitor the performance of those to whom the duty was delegated.

51.     Some or all of the Defendants had responsibility for communications with Plan participants and, in this role, caused the issuance of communications directed to Plaintiffs, the proposed Class, and the Plans' participants concerning the revenue, earnings and financial condition of the Company which affected present or potential assets or investments of the Plans and decisions of the participants relevant thereto.

### The Plans: Cincinnati Bell, Inc. Savings and Security Plan and Broadwing Retirement Savings

52.     The Cincinnati Bell, Inc. Savings and Security Plan is a defined contribution plan covering all hourly employees of the Company and certain of its subsidiaries.

53.     The Broadwing Retirement Savings Plan is a defined contribution plan covering all salaried employees of the Company and its subsidiaries and covering hourly employees of certain of its subsidiaries.

54.     At all relevant times, the Plans were "defined contribution plans" within the meaning of ERISA, 29 U.S.C. §1002(34), and "eligible individual account plans" within the meaning of ERISA, 29 U.S.C. §1107(d)(3). Further, the Plans were qualified cash

13

or deferred arrangements within the meaning of the Internal Revenue Code §401(k), 29 U.S.C. §401(k).

55.     As evidenced by the provisions of the Plans' Summary Plan Descriptions, the Plans were intended to be long-term investments, that is, they were "intended as a long-term savings Plans for retirement."

56.     At all relevant times, the Company was the Plans' sponsor.

57.     At all relevant times, Defendants acted as fiduciaries of the Plans pursuant to ERISA, 29 U.S.C. §1002(21)(A). Defendants exercised discretionary authority or control over the management or administration of the Plans  and authority or control in connection with the management or disposition of the Plans' assets.

58.     The Plans authorized a participant who had been credited with at least one year of eligible service to make a pre-tax and/or after-tax contribution on a weekly basis, in an amount of not more than 16% of the participant's total eligible compensation. The maximum annual contribution to the Plans by participants in 2000 and 2001 was $10,500. The Company matched 66 2/3% of an employee's "basic savings contributions." An employee's basic savings contributions weregenerally equal to the portion of the employee's contribution for any week not in excess of a certain amount that wasset forth in the Plans and based on the employee's base pay for the week.

59.     The Trustee of the Plans holds the investments of the Plans in trust on behalf of the participants and beneficiaries.Throughout the relevant period, participants could elect to have their contributions invested in the Broadwing, Inc. Common Stock Fund, which consisted of Broadwing common stock or a number of other mutual funds.

14

60.     The Cincinnati Bell Savings and Security Plan provided, until amended

effective January 1, 2003, that the Employer matching contribution was "for exclusive

investment in Cincinnati Bell Inc. Shares." Plan fiduciaries, however, were charged by

ERISA with a duty of prudence and care that superceded this Plan provision. ERISA

Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), specifically provides that a fiduciary is

to act "in accordance with the documents and instruments governing the plan," but only

"insofar as such documents and instruments are consistent with" the other provisions of

ERISA, including but not limited to the "Prudent Man Standard of Care" set out in ERISA

Section 404(a).

61.     Under the facts and circumstances of this case, the Cincinnati Bell

Savings and Security Plan fiduciaries could not adhere to the "exclusive investment in

Cincinnati Bell, Inc. Shares" provision after the risks attendant to investing in Company

stock rose to a level of imprudence that was inconsistent with the "Prudent Man

Standard of Care." The Cincinnati Bell Savings and Security Plan's plan documents did

not specifically restrict the trading of Company stock that had been allocated to

participants via the Employer matching contributions. Instead, Defendants, on a

discretionary basis, even though they were obligated to act as fiduciaries under the

Plan, imposed certain restrictions on the trading or diversification of such stock by

Plaintiffs, the Plan beneficiaries and participants, and the proposed Class.

62.     The Broadwing Retirement Savings Plan plan documents did not require

that Employer matching contributions be invested in Company stock. However, until at

least 2001, Defendants on a discretionary basis, even though they were obligated to act

as fiduciaries under the Plan, imposed certain restrictions on the trading or

15

diversification of such stock by Plaintiffs, the Plan beneficiaries and participants, and the proposed Class.

## The Company and Investment Risk

63.     On November 9, 1999, Cincinnati Bell Inc., a local telephone company with more than a century of operating history in Ohio and Northern Kentucky, acquired IXC Communications, a company that had built up a nationwide optical network, in a merger transaction valued at more than $ 3.2 billion (the "Merger"). Pursuant to the Merger, the combined company took the name Broadwing and IXC Communications became a subsidiary of Broadwing, renamed Broadwing Communications, Inc. ("Broadwing Communications").

64.     The stated purpose of the combined company was to "provide world-class service on a national level by combining two sets of strengths: its national optical network and Internet backbone and its state-of-the-art local network with a well-regarded brand name and reputation for service," according to the 2002 Broadwing annual report, filed with the SEC on Form 10-K.

65.     Pursuant to the Merger between Cincinnati Bell and IXC Communications, Defendant Broadwing assumed $1 billion of IXC's indebtedness. The attempt to transform Broadwing from a local wireline voice communications provider to a national provider of data, voice and Internet services, and a regional provider of wireless services, and the related cost of constructing a 18,000 mile plus fiber network, drove the Company deeper into debt. Immediately before the commencement of the Class Period, at December 31, 2000, the Company's reported combined long-term and short-term indebtedness stood at $2.7 billion. The indebtedness was offset on the Company

16

balance sheet by intangible "goodwill," acquired in connection with the IXC acquisition. The Company valued the "goodwill" at $2.2 billion. The Company's reported shareholder equity, as of December 31, 2000, was $2.01 billion, according to the Company's Form 10-K for the year ended December 31, 2000, filed with the Securities and Exchange Commission (SEC).

66.     Prior to the Merger, Cincinnati Bell was a financially strong telecommunications provider, primarily of local telephone services. Cincinnati Bell stock was considered to be a dependable "widows and orphans" stock. Indeed, the *Cincinnati Post* reported that Cincinnati Bell had been a "poster child" for low-risk investments, because it was a regulated company and the "earnings were always there." The perception was that it was a relatively low risk investment because it was a regulated monopoly.

67.     With the Merger in 1999 and Broadwing's implementation by of a new business Plan, the nature of the Company was to dramatically change. Rather than being a regional telephone company operating in a heavily regulated monopoly, the business plan was to create an high-growth nationwide enterprise centered on the carrying of internet traffic and related telecommunications to provide related high-technology services.

68.     The change in the nature of the Company was immediately apparent. For example, Broadwing almost immediately ended Cincinnati Bell's long-standing history of dividend payment, while at the same time promising double-digit growth in the stock's value, improvement in profit margin, and better stock performance. Indeed, by late

2000, Defendant Ellenberger stated, as a favorable fact, that while Broadwing's competitors were growing at 6% per year, Broadwing was growing at 20%.

69.    Throughout the Class Period Defendants represented to investors that Broadwing's business was strong; that Broadwing Communications had unique attributes that set it apart from its competitors in the industry (such as Global Crossing and Qwest, among others) and that immunized it from the adverse effects of the industry-wide downturn and related "bandwidth glut;" that the Company was successfully achieving strong financial results and executing on its business plan; and that the Company's goodwill asset was reasonably valued at $2.2 billion. In its quarterly SEC fillings and in news releases, the Company reported strong year-over-year revenue increases throughout most of 2001 and attributed a major portion of the increases to its purportedly burgeoning broadband segment.

70.    The truth was that Broadwing was a severely undercapitalized entity with insufficient cash from operations to service its massive debt. Defendants hid this state of affairs by inflating revenue through the use of undisclosed "Indefeasible Right of Use" (IRU) sales and sham swap transactions and by failing to write-down the $ 2.2 billion in "goodwill" recorded in connection with the acquisition of Broadwing Communications (previously known as IXC Communications). Defendants persisted in not disclosing the truth, even after it became apparent to Defendants, but not to the Plaintiffs, the Plans' beneficiaries and participants, and the Class, nor the investing public, that this asset was severely impaired and overstated in the Company financial records.

71.    "IRU" or "Indefeasible Right of Use" refers to leases, which are typically long-term, that grant a telecommunications carrier bandwidth capacity for a designated

18

period of time. Under Generally Accepted Accounting Principles (GAAP), IRU revenues should be recognized by the lessor over the life of the contract. This is the case even if the lessee pays the full lease amount at the outset of the term. To the extent a company engages in IRU sales and, therefore, receives large amounts of cash up front while recognizing the corresponding revenue over the life of a long-term contract, there may be little coincidence between the Company's revenue and current cash flow.

72.     IRU sales are generally one-time transactions with other telecommunications carriers. In 1999-2000, carriers sometimes swapped IRUs in transactions, with no real economic purpose, other than to artificially inflate reported revenue and earnings through the improper, immediate recognition of revenue and the improper, long-term capitalization of related expenses.

73.     Throughout 2000 and 2001, Broadwing issued favorable press releases about its operations and management successes. Its management, including the Individual Defendants, made presentations touting what they alleged to be Broadwing's unique capabilities in the telecommunications industry. These presentations boasted that the Company was not experiencing the same difficulties as competitors, implying that the revenue from sales of Broadwing products was being increased by new customers and that it had steady, sustainable business partners. Broadwing and Defendants made statements to this effect in press releases issued January 17, 2001, January 24, 2001, and March 13, 2001.

74.     Defendants' January and March 2001 statements were false or misleading because Broadwing possessed no unique capabilities and was experiencing the same difficulties as competitors in attracting customers and growing revenues and earnings.

19

Moreover, the Company was not increasing its bandwidth revenue by winning over new customers with unique and superior services, but rather through the use of IRU leases with other carriers and sham swap transactions.

75.    Broadwing's broadband revenue flow was extraordinarily unreliable. The revenue was derived from lease transactions with its competitors and other customers who were themselves vulnerable to the telecommunications industry's downturn. There was no reasonable basis for the statements that customer usage and related revenues would remain on the current levels or grow.

76.    Broadwing misled the SEC, public investors, Plaintiffs, the Plans' participants and beneficiaries, and the proposed Class. For example, on March 16, 2001, Broadwing filed its Form 10-K in which it claimed to comply with particular accounting standards, including recently issued SEC Staff Accounting Bulletin (SAB) 101, 17 CFR Part 211. Generally, the SEC's SAB 101 requires that revenue should not be recognized until it is realized or realizable and earned. The Company reported that it complied with SAB 101 beginning in January 2000 and modified its policies accordingly. In fact, however, the Company did not fully adopt SAB 101 as required and improperly accelerated recognition of revenue in violation of SAB 101. The Company also reported that its revenue recognition complied with the accounting standards known as Generally Accepted Accounting Principles (GAAP), when in fact it did not.

77.    In addition, Broadwing reported in its March 16, 2001 10-K that the value of its "goodwill" and intangible assets was $2.6 billion, primarily from the purchase of IXC. The Company recognized in the 10-K that as a result of the IXC acquisition, the

value of the "goodwill" and intangibles required adjustment. Broadwing reported that the adjustment did not have a "material impact" on the purchase price allocation.

78.    The misleading and false public statements continued.  On March 30, 2001, April 5, 2001, and April 19, 2001, the Company issued press releases, all containing statements stressing Broadwing's unique capabilities, proclaiming that Broadwing was attracting new customers, and stating that Broadwing was continuing to improve its market share.  The statements were false. The truth was that Broadwing was a severely undercapitalized entity with insufficient cash from operations to service its massive debt. However, Defendants hid this state of affairs by inflating revenue.

79.    The Broadwing customer base was not growing.  Many of its customers were one-time customers from whom they had no reasonable expectation of future business.  Moreover, the value of the "goodwill" reported in the 10-Q was subsequently proven to be false by the fact that the Company later made a $2 billion non-cash "goodwill" write down.  That is, on March 27, 2003, the Company reported that:

> In accordance with SFAS [Statement of Financial Accounting Standards issued by the Financial Accounting Standards Board in the United States] 144, the company recorded a non-cash asset impairment charge at its Broadwing Communications subsidiary of $2.2 billion for the fourth quarter. The net impact of this charge reduced the company's earnings from continuing operations by $6.55 per share for the fourth quarter and full year 2002.

80.    Press releases such as those described emphasizing Broadwing's unique abilities, the opinion that Broadwing's competitors' dismal financial reports were beneficial to Broadwing's financial health, and what purported to be record results, were released on May 24, 2001, June 8, 2001, June 27, 2001, and July 18, 2001.  Like the

21

other prior public statements, and for the same reasons described above, the Company press releases were not true.

81.     Broadwing's Form 10-Q filed on August 14, 2001 contained statements similar to the previous 10-Qs. The 10-Q stated that it complied with SAB 101 when in fact it did not. Moreover, the implication in the 10-Q that revenue was increasing was false. In addition, the representations of the value of the goodwill were grossly overvalued pursuant to Generally Accepted Accounting Principles (GAAP).

82.     The truth finally began to emerge in October 2001. On October 16, 2001, Broadwing announced dramatically reduced projections for revenues for fiscal 2001. As a consequence, the value of the Broadwing stock declined by more than 31% on a single day.

83.     On November 14, 2001, Broadwing filed its Form 10-Q for the third quarter ended September 30, 2001. This report confirmed that Broadwing's reported year-over-year revenue growth was slowing. In the Form 10-Q the Company reported revenue of $597 million, which was up by $67 million over the third quarter of 2000, but down by $11 million from the $608 million in revenue reported the previous quarter. Similarly, broadband revenue of $304 million was up by the amount of $40 million in comparison to the prior year's third quarter 2000 broadband revenue of $264 million. But, the third quarter 2001 revenue was actually $14 million less than the $318 million in broadband revenue reported the previous quarter.

84.     In the November 14, 2001 third quarter Form 10-Q, the Company claimed that the sequential revenue decline "was primarily the result of demand for broadband services decreasing as customers have delayed purchasing activities, migrated traffic

22

from the company's network, or entered into bankruptcy." The Form 10-Q was signed by Defendant Mooney. The Form 10-Q was materially false and misleading because it failed to disclose that the Company, in the third quarter, had continued to improperly accelerate revenue recognition in violation of SAB 101 and GAAP and continued to engage in sham swap transactions designed to falsely inflate revenues. Moreover, the Form 10-Q was materially false and misleading because the Company continued to overvalue its goodwill and other intangible assets and shareholder equity.

85.    On November 29, 2001, Broadwing announced that the Company was laying off 15% of its workforce, that it would incur a restructuring charge of between $250 million to $300 million in the fourth quarter, and that Broadwing Communication President Rick Portin had resigned.

86.    On February 5, 2002, Broadwing announced that it was selling its telephone directory business, a solid and profitable business, for $345 million to "decrease Broadwing's debt."

87.    On March 28, 2002, the Company filed its Form 10-K for the year ended December 31, 2001. It disclosed for the first time that 8 of the Company's top 10 customers, which as a group accounted for 17% of total revenue in 2001, were large telecommunications carriers. These carriers were themselves vulnerable to the telecommunications industry's financial woes. The Company's largest customer, accounting for approximately 5% of Company revenue in 2001, was in Chapter 11 bankruptcy proceedings.

88.    The March 28, 2002 Form 10-K also reported that approximately 25% of the Company's broadband revenue was provided by IRU agreements. A large

23

percentage of revenue derived from IRU sales should have caused the Defendants to cast doubt on the accuracy of the Company's stated revenue because, among other reasons, these are one-time transactions with other carriers, rather than with the types of long-term customers Broadwing needed to attract and retain if its broadband business was to succeed.

89.     The Company's March 2002 Form 10-K disclosed that it expected to take a "goodwill" write down on its financial statements in excess of $1 billion, thereby eliminating a large portion of a substantial asset on the Company balance sheet. Even this huge "goodwill" write down grossly understated the true value of the "goodwill" asset. At the time this 10-K statement was issued, Defendants knew or recklessly disregarded that they would eventually be required to write down "goodwill" by a total of at least $2 billion, thereby eliminating virtually all shareholder equity, including much of the value of the Plans' assets.

90.     The Company's March 2002 Form 10-K continued the prior pattern of issuing materially false and misleading statements with respect to its revenue and borrowing capacity: The Company reported 2001 revenue of $2.3 billion, which was $300 million or 15% greater than 2000, with broadband contributing 63% of that revenue growth. With respect to its borrowing capacity, the Company stated, in relevant part: "The Company believes that its borrowing availability will be sufficient to provide for its financing requirements in excess of amounts generated by operations during 2002."

91.     On April 17, 2002, the Company issued a press release over the PR Newswire to announce its financial results for the first quarter ended March 31, 2002.

The Company reported a 4% revenue decrease, but this report exceeded analysts'

expectations. With respect to the Company's financial result, the release stated:

> "We are encouraged by the trends we saw in the first quarter," said Rick
> Ellenberger, Broadwing, Inc. chairman-elect and CEO. "Our core
> businesses were strengthened, our capital spending of $53 million was the
> lowest ever, we retired $284 million of our bank debt, an the 4 percent
> revenue decline was primarily attributable to our earlier disclosed decision
> to exit the construction business. The decisive actions we undertook to
> restructure our business are generating measurable cost savings as every
> one of our major businesses achieved good sequential EBITDA [earnings
> before interest, taxes, depreciation and amortization] improvement."

92.    The full truth was not disclosed by the Company until the filing of the 10-Q

for the first quarter of 2003. Not until then did Plaintiffs, Plans' participants and

beneficiaries, proposed Class members, analysts, and the public have the opportunity

to become fully aware of the true extent of the financial trouble Broadwing had created

for itself. Adverse reports regarding Broadwing appeared in Business Wire,

TheStreet.com, and Fidelity Capital Markets. As investors accurately learned about

Broadwing's financial picture, stock prices proceeded to fall further.

93.    In the meantime, some individuals who were aware of the true financial

circumstances of Broadwing long prior to the public announcements, such as

Defendants Ellenberger and Mooney, engaged in extensive stock transactions. In the

first 8 months of 2001, Richard Ellenberger sold almost $2 million worth of Broadwing

stock. From May to August 2001, Kevin Mooney, then the Chief Financial Officer and to

become, effective September 17, 2002, the Company Chief Executive Officer, sold $1.1

million in Company stock.

94.    On information and belief, Defendants had access to adverse undisclosed

information about the Company's business, operations, products, operational trends,

financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

95.     Because of the access to adverse undisclosed information about the Company, Defendants knew, or should have known, that, during the Relevant Period, the risks involved in connection with the purchase and holding of Company stock were growing rapidly, and that the Plaintiffs, the beneficiaries and participants in the Plans, and the proposed Class members were not aware of these sharply increasing risks. Further, Defendants knew or should have known that information being disseminated to the Plan participants, by virtue of Company statements to the public, regarding the status of the Company, and thereby the status of the Plan investment alternatives, was inaccurate or misleading.

96.     True and accurate information regarding the Company would have revealed that the Plan assets invested in Company stock were at serious risk of loss. Defendants, as fiduciaries with respect to the Plan, had a duty not to materially mislead the Plans' participants, a duty to correct misleading information disseminated regarding the Plans' assets, a duty to disclose information to allow other fiduciaries or participants to take timely action to protect the Plans' assets, and a duty to act to protect the Plans' assets.

97.    Plaintiffs allege on information and belief that Defendants, including Defendants Ellenberger, Mooney, and Cassidy, and through them the Company, were aware of the facts set forth in the prior paragraphs above regarding the Company's deteriorating financial situation, and as a result they knew that the risks attendant to holding Broadwing stock were rapidly growing, such that continued concentrated investment in Broadwing stock was imprudent.

98.    Specifically, the Defendants knew well before they finally admitted it publicly that the Company was severely undercapitalized and would not be able to service its debt from actual cash earned from operations. They also knew that the Company was increasing investment risks by employing aggressive and improper accounting. These accounting artifices included inflating revenue via IRU sales and swaps and failing to reduce the huge $ 2.2 billion "goodwill" balance sheet entry resulting from the IXC Merger, all in an attempt to cover up the basic financial weaknesses inherent in their risky business plan.

99.    But, Defendants did nothing to protect the Plans' participants and beneficiaries from these growing risks. Defendants did not disclose the risks. They not only permitted, but indeed encouraged continued concentrated investment in Company stock as though it were a prudent retirement investment. Defendants' failure to protect the Plans' participants and beneficiaries was exacerbated because, unlike the fiduciaries, the participants and beneficiaries were unaware of the true facts and the the magnitude of these risks.

100.    Plaintiffs allege on information and belief that Defendants, including at least Defendants Ellenberger, Mooney, and Cassidy, and Broadwing, were duty-bound

27

to monitor the other fiduciaries of the Plans and, if and as necessary, provide them with information necessary to the conduct of their respective offices. This information should have included, at a minimum, information regarding the risks referred to in the preceding paragraph. On information and belief, these inside Defendants did not provide the other fiduciaries with such information. This failure constituted a breach of fiduciary duty.

101. On information and belief and in anticipation of further discovery, and due to those actions as alleged above, Plan shares were consistently traded at a price above fair market value, as that term is defined under ERISA and its governing regulations. The misrepresentations made by Broadwing and Individual Defendants in SEC filings were directly communicated to the Plans' participants in prospectuses, Summary Plan Description (SPD) documents and other Plan documents.

102. Defendants knew or were under a fiduciary obligation to discover and disclose to Plaintiffs and the Class that there were serious problems with Broadwing's ongoing financial situation prior to the middle of 2002 as detailed above, yet failed to do so.

103. Prior to and throughout the Class Period, Defendants had a fiduciary duty to monitor the prudence of the various investment options offered by the Plans.

104. Appropriate evaluations of the prudence of investment alternatives would have included the long term investment performance of the investment option, the risk versus reward of the option, the performance of the investment option as compared to objective benchmarks. An appropriate evaluation of investment alternatives would have included monitoring of the performance and suitability of the investment option for

inclusion within the Plans. Investment options which were no longer prudent should have been removed from the Plans as investment alternatives.

105. The Company Shares Fund was one of the investment options offered pursuant to the provisions of the Plans. Defendants elected to invest all participant and Company contributions to the Company Shares Fund in Broadwing stock. Upon information and belief and in anticipation of further discovery, the Company Shares Fund was not reviewed or evaluated by any Defendant on a continuing or regular basis to determine whether it remained a prudent investment for participant contributions.

106. Prior to and throughout the Class Period, Broadwing stock exhibited volatile swings in its value. Broadwing stock failed to provide a fair return commensurate with the prevailing rate of returns on comparable investments. Had the Defendants adequately investigated the reasonableness of Broadwing stock as an investment option, a reasonable fiduciary would have known that Broadwing stock, and therefore the Company Stock Fund, was not a reasonably prudent investment for the Plans.

107. By failing to investigate properly or to monitor the prudence or otherwise of the Company stock as an investment alternative, the Individual Defendants breached their fiduciary duty, and Plaintiffs, the Plans' participants and beneficiaries, and the proposed Class members, and the Plans themselves were harmed. By maintaining the Company Shares Fund as an investment alternative and by continuing to make monthly contributions to the Company Shares Fund through employer matching contributions, the Defendants abused their discretion and the Plaintiffs, the Plans' participants and

beneficiaries, and the proposed Class members, and the Plans themselves were harmed.

108. Throughout the Class Period, Defendants continued to advise, offer, issue, direct, and engage in the purchase and holding of Company shares as prudent Plan investments. Assets of the Plans were highly concentrated in Broadwing common stock at all relevant times when the stock was selling at above its fair market value, as that term is defined under ERISA and its governing regulations. Such excessive concentration in Broadwing shares was a result of the restrictions on trading Fund Shares which existed for most participants, as well as a result of decisions and actions of Defendants described above.

109. As a result of Defendants' material misrepresentations and failure to disclose the material facts which they knew or were under a fiduciary obligation to discover regarding the adverse condition of the Company, Plaintiffs and the Class were misled and deprived of their opportunity to make an informed judgment as to their investment in Broadwing stock. Had the Plans' participants been properly and adequately informed about the true financial condition of the Company and given accurate information concerning Broadwing's prospects and associated risks, they would not have purchased and held the Broadwing stock as to which they had discretion during periods in which its cost exceeded its statutorily defined fair market value and would not have sustained the damages they ultimately experienced.

110. As a further result of Defendants' material misrepresentations and failures to investigate as described above, they caused the Plans and its Predecessor Plans and individual participants to invest in Broadwing securities at price in excess of the fair

market value of those securities, and with no reasonable probability that those securities would provide a fair return commensurate with the prevailing rate of returns on comparable investments.

111. Upon information and belief and in anticipation of further discovery, at all relevant times, despite Defendants' knowledge of the Company's true financial condition and the risks associated with investing in Company stock, Defendants conducted numerous Company meetings or sent written communications to employees in which they touted the financial health of the Company and otherwise encouraged participants to invest their monies in Broadwing common stock. As a result of Defendants' failure to timely disclose adverse financial information and the risks associated with investing in Company stock at these meetings, Plaintiffs and Class members were deprived of the opportunity to make informed decisions with respect to the investment of their retirement savings.

112. On information and belief and in anticipation of further discovery, Defendants have done nothing to remedy the problems caused by the Plans' over-concentration in Broadwing common stock. Defendants' imposition and maintenance of restrictions on the transfer of stock purchased through Company matching contributions has had the effect of depriving Plaintiff and Class members of having the opportunity to exercise full control over their Plans' assets and of forcing them to concentrate their retirement monies in Company stock. This over-concentration in Company stock resulted in substantial retirement fund losses to Plaintiff and Class members. Defendants actions (or lack thereof) deprived Plaintiff and Class members of the opportunity to exercise control over the Plans' assets because they did not have the

31

opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan, and incidents of ownership appurtenant to such investments.

113. At all relevant times, Defendants deprived all participants of the opportunity to exercise control over their Plan assets because they did not have the "opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan, and incidents of ownership appurtenant to such investments" pursuant to 29 C.F.R. § 2550.404c-1(b)(2)(i)(B).

114. At all relevant times, Plaintiffs and members of the Class did not exercise independent control over the assets in the Plan because Defendants subjected Plaintiffs and Class members to improper influences or concealed material facts regarding certain investments. 29 C.F.R. § 2550.404c-1(c)(2)(i)-(ii).

115. For the reasons set forth above, Defendants are not relieved of their fiduciary duties to the extent that they might otherwise have been so under ERISA Section 404(c), 29 U.S.C. § 1104(c).

116. As a result of Defendants' failure to act in a prudent manner, in relation to the Plans' investment in Company stock, Company stock constituted over 50% of all the Plans' assets in 2001 and over 70% in 2002. The percentage of the Company's stock in the Plans has not retreated significantly from these levels.

117. Since January 2000, Broadwing common stock has collapsed in value from approximately $40 per share to less than $6 per share.

118. Accordingly, Defendants are not relieved of their fiduciary duties under ERISA, 29 U.S.C. §1104(c).

32

## Defendants' Breaches of Fiduciary Duty

119.    ERISA is a comprehensive statute covering virtually all aspects of

employee benefit plans, including retirement savings plans, such as the Plans and their

predecessor plans:

> It is hereby declared to be the policy of this Act to protect interstate
> commerce and the interests of participants in employee benefit plans and
> their beneficiaries, by requiring the disclosure and reporting to participants
> and beneficiaries of financial and other information with respect thereto, by
> establishing standards of conduct, responsibility, and obligation for
> fiduciaries of employee benefit plans, and by providing for appropriate
> remedies, sanctions, and ready access to the Federal courts.

ERISA Section 2(b), 29 U.S.C. §1001(b).

120.    Under ERISA, those responsible for plan management and oversight

stand in a fiduciary relationship in relation to plan participants. Pursuant to ERISA, a

"fiduciary" is defined broadly to include all persons or entities that are able to exercise

discretionary authority or control over the management of a plan or its assets.

121.    Under ERISA, those responsible for plan management and oversight stand

in a fiduciary relationship in relation to plan participants. Pursuant to ERISA, a

"fiduciary" is defined broadly to include all persons or entities that are able to exercise

discretionary authority or control over the management of a plan or its assets.

122.    ERISA requires strict fidelity and loyalty in the execution of a plan's

management pursuant to 29 U.S.C. §1002(21). In addition, ERISA imposes on plan

management a fiduciary duty of prudence, requiring those responsible for plan

management to "discharge his [or her] duties with respect to a plan solely in the interest

of the participants and their beneficiaries and ... with the care, skill, prudence, and

diligence under the circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of a

33

like character and with like aims." 29 U.S.C. §1104(a)(1). ERISA also imposes on those responsible for plan management a duty of loyalty, requiring the fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and their beneficiaries and ... for the exclusive purpose of ... providing benefits to the participants and their beneficiaries." *Id*.

123. Defendants' fiduciary duties of loyalty, due care and prudence include a duty to timely disclose and inform participants and beneficiaries of any material adverse information about the Company. When a plan is composed of various investment funds, such as the Broadwing 401(k) Plans, this duty to inform and disclose also includes:

(a)     the duty to impart to the plan's participants material information which the fiduciary knows or should know is sufficient to apprise the average plan participant of the risks associated with investing in any particular investment; and

(b)     a duty to convey complete and accurate information material to the circumstances of the plan participants and their beneficiaries.

The disclosure duties and fiduciary duties imposed on plan management by ERISA are designed to reduce the disparity in access to company information that exists between the fiduciaries and the Plans' participants and their beneficiaries.

124. ERISA imposes on plan fiduciaries the duty, *inter alia*, to adhere to the terms of the plan, including those purposes established in the plan document as, in this instance, "to provide ... retirement security for eligible employees."

125. Other duties imposed upon those who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management or disposition of plan assets include, but are not limited to:

34

(a)     The duty to investigate and evaluate the merits of decisions affecting the use and disposition of plan assets;

(b)     The duty to evaluate all investment decisions with "an eye single" to the interests of plan participants and beneficiaries;

(c)     The duty to avoid placing themselves in a position where their acts as officers, directors or employees of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan, and, if they find themselves in such a position, to seek independent, unconflicted advice;

(d)     To the extent that a party is responsible for appointing and removing named fiduciaries, the duty to monitor those persons who have been named;

(e)     The duty, if a directed trustee, to act only upon those directions which are consistent with the terms of the plan and with ERISA;

(f)     The duty to disclose and inform of any material adverse information about the company which duty entails among other things:

    (i)     a duty not to make materially false and misleading statements or misinform plan participants about the true financial condition of the company;

    (ii)     an affirmative duty to inform plan participants about material adverse factors which were affecting the company any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; and

    (iii)     a duty to convey complete and accurate information material to the circumstances of plan participants and their beneficiaries; and

(g)     When a plan is composed of various investment funds, such as the Broadwing 401(k) Plans, the duty to inform and disclose also includes the duty to impart to plan participants material information which the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment.

126.     Defendants breached their fiduciary duties of loyalty and prudence with respect to the Plans' use of Company stock as a plan investment for, among other reasons, the following:

35

(a)     The Plans' investment in Company common stock, as a
        percentage of the Plans' portfolios, was an undiversified
        investment in a single stock that carried with it an inherently high
        degree of risk and volatility;

(b)     Defendants failed to timely provide Plaintiff and Class members
        with complete and accurate information about Broadwing's
        common stock and the risks associated with individual
        participants' and the Plans' substantial investment therein;

(c)     Defendants breached their fiduciary duty and their duty to
        inform and disclose, by encouraging Plaintiff and Class
        members to continue to make and maintain substantial
        investments in Broadwing common stock in their Plan accounts;
        and

(d)     Defendants failed to monitor the prudence of Broadwing
        stock as an investment alternative for the Plans.

127.    In addition to Defendants' duties of loyalty and prudence, ERISA imposed

fiduciary duties on Defendants that entail a duty on the Plans' management to conduct

an independent and continuing investigation into the merits of the Plans' investments to

ensure that each investment is suitable for the Plans. Defendants breached their

fiduciary duties of loyalty and prudence by failing to investigate and monitor the

suitability of the Company's common stock as an investment option. Had Defendants

conducted a reasonable investigation into the Plans' investment in Company stock they

would have known that, during the Relevant Period, Broadwing common stock was not

a suitable or prudent investment for the Plan participants.

128.    Defendants' duty of loyalty also entailed a duty to avoid conflicts of interest

and to resolve them promptly should they occur. Under ERISA, a fiduciary must always

act for the sole benefit of the participants and their beneficiaries. Defendants breached

their duty of loyalty by failing to avoid conflicts of interest and to resolve such conflicts

promptly when they did occur. Defendants continued to invest the participants' and

beneficiaries' monies in Broadwing common stock and imposed restrictions on the sale of such stock despite the unsuitability of such a risky investment. Thus, Defendants failed to act to protect Plaintiffs' and Class members' interests in the administration of the Plans.

129. As a result of Defendants' breaches of their fiduciary duties owed to Plaintiffs and Class members, the Plans suffered substantial losses and Plaintiffs and Class members were harmed because, throughout the Relevant Period, a substantial percentage of the Plans' assets were invested in Broadwing common stock and because the value of Broadwing common stock substantially under-performed the market and other reasonable investment alternatives. Since Plaintiffs and Class members did not have independent control over how their assets were ultimately invested, Defendants were responsible for ensuring the Plan's investments were and remained prudent.

## COUNT I
## Claim for Breach of Fiduciary Duty of Prudence
## Against All Defendants

[ERISA §§404(a)(1), 409, 502(a)(2) and (3), 29 U.S.C. §§1104(a)(1), 1109, 1132(a)(2) and (3)]

130. Plaintiffs incorporate by reference and reallege the prior paragraphs.

131. ERISA §404(a)(1), 29 U.S.C. §1104(a)(1), requires, inter alia, that a plan fiduciary discharge his, her or its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries, with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and

37

familiar with such matters would use in the conduct of an enterprise of a like character
and with like aims.

132. Defendants' selection, monitoring and continuation of the investment
alternatives under the Plans were subject to the above-described fiduciary duties. By
their acts and omissions Defendants failed to act prudently by continuing Broadwing
stock as an investment alternative under the Plans. The Defendants thereby breached
each of these fiduciary duties.

133. Defendants were obligated to monitor and evaluate, among other things,
information concerning the Company's structure, performance and prospects, including
information made public by the Company. Had Defendants done so, they would have
taken appropriate action, including one or more of the following:

> (i)   Eliminating the Broadwing stock as an investment option
>       under the Plan;
>
> (ii)  Adopting an appropriate divestment policy with respect to
>       Broadwing stock in the Plan; (iii) appointing an independent
>       fiduciary to evaluate whether Broadwing stock should remain an
>       investment option under the Plan and/or determine an appropriate
>       strategy for divestment;
>
> (iv)  Adopting a policy for limiting the amount of Broadwing stock that
>       could be held in the Plan; and/or
>
> (v)   Notifying the Secretary of Labor of the situation.

However, Broadwing and the Defendants failed to discharge their fiduciary obligations
and instead continued to manage, direct, and approve investment of assets of the Plans
in Broadwing stock and maintained it as an investment alternative. Thus Broadwing
and the Defendants breached their fiduciary duties by failing to prudently invest the
Plans' assets.

134. Defendants (i) participated knowingly in or undertook to conceal an act or omission described in this Claim of another fiduciary, knowing such act or omission was a breach; or (ii) failed to discharge his, her, or its duties, enabled another fiduciary to commit a breach described in this Claim; or (iii) had knowledge of the breach of fiduciary duty described in this Claim and failed to make reasonable efforts to remedy such breach, and therefore was also a co-fiduciary liable for the breaches committed by each other fiduciary under ERISA §405, 29 U.S.C. §1105.

135. ERISA §409, 29 U.S.C. §1109, provides, inter alia, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA §409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate, including removal of the fiduciary.

136. ERISA Section 502(a)(2), 29 U.S.C. §1132(a)(2), permits a plan participant to bring a suit for relief under ERISA §409.

137. As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered losses. These losses resulted in reductions in the value of the Plans' accounts of Plaintiffs and the Class members. If Defendants at all times had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost hundreds of millions of dollars.

138.    The Plans are entitled to the imposition of a constructive trust on any

amount by which any Defendant was unjustly enriched through his, her, or its breach of

fiduciary duty, to equitable restitution, and to other appropriate equitable monetary relief

to redress the breaches of fiduciary duty by the Defendants described in this Claim.

139.    Notwithstanding the ostensible direction of investments in Broadwing

stock by the Plans' participants, the Defendants are responsible for the Plans'

purchases and retention of Broadwing stock during the Relevant Period.  Broadwing

and the Defendants are not entitled to the protections of ERISA §404(c)(1)(B), 29

U.S.C. §1104(c)(1)(B), because the Plans' participants did not exercise independent

control over their accounts by reason of the facts that the Defendants subjected them to

improper influence with respect to the Plans' investments in Broadwing stock and the

Defendants failed to provide participants with complete and accurate information with

respect to Broadwing stock and instead provided false and misleading information.  By

law, the Plans' purchases of Broadwing stock are deemed to have been made at the

direction of the Defendants have liability with respect thereto.

**COUNT II**
Breach of Fiduciary Duty to Monitor Plan Fiduciaries Against All Defendants.
[ERISA §§404(a)(1), 409, and 502(a)(2) and (3), 29 U.S.C.
§§1104(a)(1), 1109, and 1132(a)(2) and (3)]

140.    Plaintiffs incorporate by reference and reallege the prior paragraphs.

141.    At all relevant times, the Defendants were and acted as fiduciaries, within

the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to the Plans to

the extent that they were charged with, responsible for, and/or otherwise assumed, the

duty of selecting, monitoring, and, when and if necessary, removing other fiduciaries.

40

142. A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to monitor, the merits of the investment alternatives in the Plans, including employer securities, to ensure that each investment is suitable. Thus, in connection with their duties to monitor the Plans' other fiduciaries, the Defendants were responsible for monitoring the manner in which those fiduciaries were investing the Plans' assets within the fund options, as well as the investment of profit sharing contributions.

143. As fiduciaries with knowledge that the Plans were being invested in Broadwing stock by investing fiduciaries, the Defendants also had an affirmative duty to disclose to each other such material facts about the financial condition of the Company that they knew or should have known the other Defendants needed in order to make sufficiently-informed decisions, based on accurate information, concerning those investments.

144. The Board Committee Defendants and the Director Defendants breached the fiduciary duties they owed to the Plans' participants by:

(a) Failing to adequately monitor the Plans' fiduciaries' investment of the Plans' assets;

(b) Failing to adequately monitor the Plans' other fiduciaries' implementation of the terms of the Plans, including but not limited to the investment of the Plans' assets, the establishment of an investment policy, and the ongoing monitoring of that policy and the Plans' investments;

(c) Failing to disclose to the Defendants the other investing fiduciaries material facts concerning the financial condition of Broadwing that they knew or should have known were material to prudent investment decisions concerning the use of Broadwing stock in the Plans;

(d) Failing to remove fiduciaries who they knew or should have known were not qualified to loyally and prudently manage the Plans' assets;

    (e)    Failing to conduct an independent investigation into and to monitor the of investing the Plans' assets in Broadwing stock;

    (f)    Knowingly participating in the Defendants' breaches by knowingly accepting the benefits of those breaches, both personally and on behalf of the Company; and

    (g)    Failing to remedy those fiduciaries' breaches, having knowledge of them.

    145.   If Defendants had at all times carried out their fiduciary duties to monitor

the Plans' fiduciaries, including discharging those engaged in breaches of fiduciaries'

duties and those with conflicts of interest (and replacing the discharged fiduciaries with

qualified fiduciaries), the losses suffered by the Plan would have been minimized or

avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties

alleged herein, the Plans, and indirectly Plaintiffs and the other class members, lost

millions of dollars.

    146.   Each of the Defendants:

    (i)    participated knowingly in or undertook to conceal an act or omission described in this Claim of another fiduciary, knowing such act or omission was a breach; or

    (ii)   by failing to discharge his, her, or its duties, enabled another fiduciary to commit a breach described in this Claim; or

    (iii)   had knowledge of the breach of fiduciary duty described in this Claim and failed to make reasonable efforts to remedy such breach, and therefore was also a fiduciary liable for the breaches committed by each other fiduciary under ERISA §405, 29 U.S.C. §1105.

As discovery progresses in these cases, Plaintiffs will seek leave to amend this

Complaint to identify those Defendants in addition to the Defendants with fiduciary

liability as described in this paragraph.

    147.   The Plans are entitled to the imposition of a constructive trust on any

amount by which any Defendant was unjustly enriched through his breach of fiduciary

duty, to equitable restitution, and to other appropriate equitable monetary relief to redress the breaches of fiduciary duty by Broadwing and the Defendants described in this Count.

## COUNT III
### Breach of Fiduciary Duty by Providing Incomplete and Misleading Information Against All Defendants.
### [ERISA §§404(a)(1), 409, and 502(a)(2) and (3), 29 U.S.C. §§1104(a)(1), 1109, and 1132(a)(2) and (3)]

148. Plaintiffs incorporate by reference and reallege the prior paragraphs. 149.

By making material misrepresentations to the Plans' participants in their capacity as the Plans' fiduciaries, Broadwing and the Defendants breached their fiduciary duties to act solely in the interests of the participants and to act prudently.

150. Moreover, ERISA fiduciaries have a duty to speak truthfully, to not mislead participants and to disclose truthful information on their own initiative when participants need such information to exercise their rights under the plan.

152. In a plan with various funds available for investment, this duty to inform and disclose also includes: (1) the duty to provide to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to advise the average plan participant of the risks associated with investing in any particular fund; and (2) the duty to refrain from material misrepresentations.

153. Broadwing and Defendants breached their fiduciary duties by failing to provide participants and beneficiaries with complete and accurate information regarding Broadwing stock, by transmitting incomplete, false and misleading communications to the Plans' participants, and by misleading participants and beneficiaries regarding the

soundness of Broadwing stock, and the prudence of investing their retirement benefits in Broadwing stock.

154. The breaches of fiduciary duties described in this Count caused or are presumed to have caused participants in the Plans to continue to make and to maintain substantial investments of their Plans accounts in the Broadwing stock at a time when the Defendants knew or should have known that the Fund was not a prudent investment option.

155. Each of the Defendants (i) participated knowingly in or undertook to conceal an act or omission described in this Claim of another fiduciary, knowing such act or omission was a breach; or (ii) by failing to discharge his, her, or its duties, enabled another fiduciary to commit a breach described in this Claim; or (iii) had knowledge of the breach of fiduciary duty described in this Claim and failed to make reasonable efforts to remedy such breach, and therefore was also a co-fiduciary liable for the breaches committed by each other fiduciary under ERISA §405, 29 U.S.C. §1105. As discovery progresses in these cases, Plaintiffs will seek leave to amend this Complaint to identify those Defendants with fiduciary liability as described in this paragraph.

156. The Plans are entitled to the imposition of a constructive trust on any amount by which any Defendant was unjustly enriched through his breach of fiduciary duty, to equitable restitution, and to other appropriate equitable monetary relief to redress the breaches of fiduciary duty described in this Count.

157. Plaintiffs and the Class members relied upon and/or are presumed to have relied upon the Defendants' material misrepresentations by directing that the Plans

purchase of Broadwing stock, which reliance was to the detriment of Plaintiffs, the Class

members, and the Plan because the Plan purchased Global Crossing stock and

incurred losses on those investments, which losses resulted in reductions in the value of

the Plans' accounts of Plaintiffs and the Class members.

**COUNT IV**
Breach of Fiduciary Duty to Avoid Conflicts of Interest
Against All Defendants .
[ERISA §§404(a)(1), 409, and 502(a)(2) and (3), 29 U.S.C.
§§1104(a)(1), 1109, and 1132(a)(2) and (3)]

158.    Plaintiffs incorporate by reference and reallege the prior paragraphs.

159.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest

and to resolve them promptly when they occur. A fiduciary must always administer a

plan with an "eye single" to the interests of the participants and beneficiaries, regardless

of the interests of the fiduciaries themselves or the plan sponsor.

160.    Defendants breached their duty to avoid conflicts of interest and to

promptly resolve them when they occurred by continuing to allow Company Stock as a

Plan Investment during the Class Period, by continuing to participate in various

Company compensation programs that created a substantial personal interest in certain

Defendants to maintain a high public price for Broadwing Stock, by failing to engage

independent fiduciaries and/or advisors who could make independent judgments

concerning the Plans' investments in Company stock and the information provided to

participants and beneficiaries concerning it, and generally by failing to take whatever

steps were necessary to ensure that the Plans' fiduciaries did not suffer from a conflict

of interest. Rather than resolve these conflicts of interest, Defendants instead

continued to exercise fiduciary responsibility with respect to the Plans and in doing so

45

advanced and served the interests of Broadwing and their personal interests to the
detriment of the interests of Plans' participants, for example by maintaining the Plans'
investment in Broadwing stock and maintaining Broadwing stock as a Plan investment
alternative after they knew or should have known that such actions were imprudent and
not in the interests of the Plans' participants or beneficiaries.

161.    If the Defendants had at all times discharged their fiduciary duties to avoid
conflicts of interest, including by resigning if necessary, the losses suffered by the Plans
would have been minimized or avoided. Therefore, as a direct and proximate result of
the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly
Plaintiffs and the other Class members, lost millions of dollars.

162.    The Plans are entitled to the imposition of a constructive trust on any
amount by which any Defendant was unjustly enriched through his breach of fiduciary
duty, to equitable restitution, and to other appropriate equitable monetary relief to
redress the breaches of fiduciary duty by Broadwing and the Defendants described in
this Claim.

## COUNT V
## Breach of Fiduciary Duty Against Defendant Broadwing
## and the Individual Defendants

163.    Plaintiffs incorporate by reference and reallege the prior paragraphs.

164.    The Plans are governed by the provisions of ERISA, 29 U.S.C. §§1001, *et
seq.*, and Plaintiffs and Class members are participants and/or beneficiaries in the
Plans. Defendant Broadwing and the Individual Defendants exercised discretionary
authority or control with respect to the management of the Plans and their assets and is
a fiduciary or co-fiduciary to the Plans under the terms of ERISA.

46

165. Defendant Broadwing and the Individual Defendants violated their fiduciary duties of loyalty and prudence by: (a) permitting a significant percentage of the Plans' assets to be invested in Company stock; (b) failing to adequately investigate and monitor the prudence of the Plans' investments in Company stock; (c) failing to take steps to eliminate or reduce the amount of Company stock in the Plans; (d) failing to adhere to the purposes of the Plans insofar as those purposes included *inter alia* the provision of retirement security to eligible employees; and (e) failing to give Plaintiffs and Class members adequate information about the composition of the Plans' portfolios and accurate information about Broadwing, its financial prospects and its suitability as a Plan investment.

166. Defendant Broadwing and the Individual Defendants also breached their fiduciary obligations by imposing restrictions on Plaintiffs' and Class members' investments in Company stock and by promoting Broadwing common stock as a prudent Plan investment and encouraging the Plans' participants to invest their retirement savings in Company stock.

167. At all times relevant to the allegations raised herein, each of the Defendants was a co-fiduciary of the others. Defendant Broadwing and the Individual Defendants participated in the fiduciary breaches described herein, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to comply with the provisions of ERISA and/or had knowledge of the breaches of its co-fiduciaries and failed to take reasonable efforts to remedy such breaches.

168. As a result of Defendant Broadwing's and the Individual Defendants' breaches of fiduciary duties, Plaintiffs and Class members, as well as the Plans,

suffered losses, the exact amount of which will be determined at trial. Defendants are personally liable to Plaintiffs and Class members for these losses.

## COUNT VI
### Breach of Fiduciary Duty Against
### Defendant Fidelity Management Investment Trust

169.    Plaintiffs incorporate by reference and reallege the prior paragraphs.

170.    Defendant Fidelity breached its duties of loyalty and prudence by: (a) failing to reduce the concentration of Broadwing common stock held in the Plans when it was prudent to do so; (b) failing to sell Broadwing common stock shares held by the Plans when it would have been prudent to do so; (c) failing to provide Plaintiffs and Class members with adequate information about the composition of the Plans' portfolios and accurate information about Broadwing, its financial prospects and its suitability as a Plan investment and (d) failing to take any action on behalf of plan participants and beneficiaries after it was on notice that the stock values in accounts were overstated.

171.    Defendant Fidelity knowingly participated in the fiduciary breaches of its co-fiduciaries, enabled its co-fiduciary to commit such fiduciary breaches by its own failure to comply with the provisions of ERISA, and had knowledge of the breaches of its co-fiduciaries and failed to make reasonable efforts to remedy such breaches.

172.    As a result of Fidelity's breaches of fiduciary duty, Plaintiffs and Class members, as well as the Plans, suffered losses, the exact amount of which will be determined at trial. Defendant Fidelity is personally liable to Plaintiffs and Class members for those losses.

## COUNT VII
### Breach of Fiduciary Duty–ERISA Disclosure Requirements
### Against Defendant Broadwing, Individual Defendants, and
### Defendant Fidelity Management Investment Trust

48

173.   Plaintiffs incorporate by reference and reallege the prior paragraphs.

174.   Defendant Broadwing, the Individual Defendants, and Defendant Fidelity failed to advise Plaintiffs and Class members that their investments in the Plan were at substantial risk as a result of the concentration of Broadwing stock as a percentage of the Plans' total assets.  Defendants also failed to provide Plaintiffs and Class members with accurate information about the Company's current and future financial prospects.

175.   Because of the disparity in knowledge between Defendants and Plaintiffs and Class members, Plaintiffs and Class members relied on Defendants to provide them with accurate and sufficient information about Broadwing and the Plans' investment therein, which was material to the suitability of Company stock as a prudent investment option.

176.   By failing to timely convey complete and accurate information to Plaintiffs and Class members, Defendants violated their fiduciary duty to disclose sufficient information to inform Plaintiffs and Class members of the risks associated with investment in Company stock when Defendants should have known that the failure to disclose such material information would result in losses to Plaintiffs and Class members.

177.   As a result of Defendants' failure to disclose and inform, Plaintiffs and Class members suffered losses, the exact amount of which will be determined at trial. Defendants are personally liable to Plaintiffs and Class members for these losses.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

49

a)      Determining that this is a proper class action to be certified under Rule 23 of the Federal Rules of Civil Procedure;

b)      Declaring that Defendants have violated the duties, responsibilities and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure requirements as described above;

c)      Awarding extraordinary, equitable, and  injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure;

d)      Awarding Plaintiffs, Class members and the Plans restitution and/or remedial relief;

e)      Awarding Plaintiffs, Class members and the Plans pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs; and

f)      Awarding such other relief as this Court may deem just and proper.

Respectfully Submitted,

_____SS/_____
Ann Lugbill, Esq. (0023632)
2406 Auburn Avenue
Cincinnati, OH   45219
(513) 784-1280; (513) 784-1449 - Fax
Alugbill@choice.net
*Plaintiffs' Liaison Counsel/Trial Attorney for
Plaintiff Streckfuss*

**PLAINTIFFS' LEAD COUNSEL:**

_____SS/_____
RON PARRY (0038027)
DAVID A. FUTSCHER (0039653)
Trial Attorneys
Parry Deering Futscher & Sparks

128 East Second Street
Covington, Kentucky 41011
Phone: (859) 291-9000
Fax: (859) 291-9300
rparry@pdfslaw.com
dfutscher@pdfslaw.com
*Trial Attorneys for Kurtz, Fleager, Bryant,*
*Hughes, Hurley & Jennings*

JOE R. WHATLEY, JR.
Glen Connor
Whatley Drake, LLC
Post Office Box 10647
Birmingham, Alabama 35202-0647
Phone:       205-328-9576
Fax:         205 328-9669
JWHATLEY@whatleydrake.com
GCONNOR@whatleydrake.com

Of Counsel

*Counsel for Plaintiff Bryant*:

James D. Baskin
The Baskin Law Firm
300 West 6th Street, Suit 1950
Austin, TX 78701
Phone:       512-381-6300
Fax:         512-322-9280
jbaskin@baskin.com
*Counsel for Plaintiff Fleager*

Joe Kendall
Buddy Reece
Provost Umphrey Law Firm, LLP
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
Phone:       214-744-3000
Fax:214-744-3015
breece@provostumphrey.com
*Counsel for Plaintiff Kurtz*

51

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been

served via United States mail, postage prepaid and properly addressed, on the ___ day

of _____, 2003, to the following and/or by electronic mail to those so registered

with the Court.                              /SS/..........................
                                             Ann Lugbill (0023632)
                                             2406 Auburn Avenue
                                             Cincinnati, OH 45219
                                             (513) 784-1280; (513)784-1449 (fax)
                                             *Plaintiffs' Liaison Counsel and Counsel for Plaintiff*
                                             *Streckfuss*
                                             alugbill@choice.net

### Counsel for Plaintiffs:

RON PARRY (0038027)
DAVID A. FUTSCHER (0039653)
Parry Deering Futscher & Sparks
128 East Second Street
Covington, Kentucky 41011
Phone: (859) 291-9000
Fax: (859) 291-9300
Trial Attorneys and Plaintiffs' Lead Counsel
*Counsel for Plaintiffs Kurtz, Fleager, Bryant, Hughes,*
*    Hurley & Jennings*

JOE R. WHATLEY, JR.
Glen Connor
Whatley Drake, LLC
Post Office Box 10647
Birmingham, Alabama 35202-0647
Phone:      205-328-9576
Fax:        205 328-9669
JWHATLEY@whatleydrake.com
GCONNOR@whatleydrake.com
Plaintiffs' Lead Counsel
*Counsel for Plaintiff Bryant*

Joe Kendall
Buddy Reece
Provost Umphrey Law Firm, LLP
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
Phone:        214-744-3000
Fax:          214-744-3015
breece@provostumphrey.com
Plaintiffs' Lead Counsel
*Counsel for Plaintiff Kurtz*

Richard S. Schiffrin
Joseph H. Meltzer
Edward W. Ciolko
Schiffrin & Barroway, LLP
3 Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004
Tel: (610) 667-7706
Fax: (610) 667-7056
*Counsel for Plaintiff Hughes, Hurley & s
Jennings*

James D. Baskin
The Baskin Law Firm
300 West 6th Street, Suit 1950
Austin, TX 78701
Phone:        512-381-6300
Fax:          512-322-9280
jbaskin@baskin.com
*Counsel for Plaintiff Fleager*

George E Barrett
Douglas S. Johnston, Jr.
Timothy L MilesBarrett Johnston & Parsley
217 Second Avenue N
Nashville, TN 37201
615-244-2202
gbarrett@barrettjohnston.com
djohnston@barrettjohnston.com
tmiles@barrettjohnston.com
*Counsel for Plaintiff Streckfuss*

Brian J. Robbins
Jeffrey P. Fink
Robbins Umeda & Fink, LLP
1010 Second Avenue, Suite 2360
San Diego, CA  92101
619-525-3990
619-744-3015 (fax)
fink@ruflaw.com
*Counsel for Plaintiff Kurtz*

53

**COUNSEL FOR DEFENDANTS**

Grant Spencer Cowan
Douglas Edward Hart Frost Brown Todd LLC
2200 PNC Center
201 E 5th Street
Cincinnati, OH 45202-4182
513-651-6800
513-651-6745 (fax)
gcowan@fbtlaw.com
Hart: 513-651-6709
513-651-6981 (fax)
dhart@fbtlaw.com
*Counsel for Defendants Broadwing and the Individual Defendants*

Jack Frederick Fuchs
Thompson Hine LLP
312 Walnut Street
14th Floor
Cincinnati, OH 45202-4089
513-352-6700
513-352-6741 (fax)
Jack.Fuchs@ThompsonHine.com
*Counsel for Defendant Fidelity Management Investment Trust Co.*

Charles F Seemann, III
Howard Shapiro
Heather Gail Magier
Shook Hardy & Bacon LLP
909 Poydras Street, Suite 1100
New Orleans, LA 70112
504-310-4088
504-522-5771 (fax)
cseemann@shb.com
hshapiro@shb.com
hmagier@shb.com
*Counsel for Defendant Fidelity Management Investment Trust Co.*